A. E. GREGORY, ADMINISTRATOR DE BONIS NON OF THE ESTATE OF J. M. NIXON, DECEASED, APPELLANT, v. ROBERT HARRISON, RESPONDENT.

An administrator *de bonis non* cannot call to account a removed executor, and charge him with a *devastavit,* as to the goods and chattels of his testator which have come to his hands.

The title of an executor in the effects of his testator is derived from the will, and exists independently of the letters testamentary ; and so far as it relates to money collected, and goods reduced into possession and converted, cannot be divested by the revocation of the letters testamentary. The revocation of letters testamentary, and the appointment of another administrator, can only have relation to the goods not reduced into possession, and to *choses* in action not recovered. As to goods reduced to possession, a removed executor holds them—not as his own, but as trustee for the creditors, legatees and distributees of his testator, and to them he is accountable. The administrator of a *deceased* executor occupies precisely the same position, and is a trustee for the same persons, as to the goods or effects reduced to the possession of the executor.

The commission of an administrator *de bonis non* gives him no warrant to demand from a removed executor, or administrator, any other goods or effects than those which were the goods and chattels of the testator, or intestate, at the time of his death.

An administration is correctly defined to be a " change, alteration or conversion" of the goods of the testator, or intestate, and by this is meant a change in the property, not a change in *specie.* An administrator *de bonis non* takes possession of the goods and chattels of the testator, or intestate, which re-

main in specie and unadministered. He is appointed to finish what is left unfinished, and for no other purpose.

Creditors have a right to sue the representative of a deceased executor, or a removed executor, for a debt of the original testator, without having first obtained a judgment against the executor in his life time, and heirs, legatees and distributees can assert their rights against the same persons.

This case was decided in the Court below, by the Hon. THOMAS BALTZELL, Judge of the Middle Circuit, sitting in and for the County of Gadsden, on the 20th of November, A. D., 1850. The demurrer of defendant to complainant's bill was sustained, and the bill dismissed, and from this decision, an appeal was taken.

The case is fully stated in the opinion delivered by the Court, affirming the opinion of the Court below.

The main, if not the only, question in the case presented for the decision of the Court is, whether an administrator *de bonis non* is entitled, by virtue of his commission as such, to call a removed executor to account, and charge him with a *devastavit,* as to the goods and chattels of his testator which have come to his hands.

*Dupont,* for Appellant, argued—

That there is nothing in the English books, of a *positive character*, opposed to the exercise of such authority by an administrator *de bonis non.* That the definition given of an administration, viz: "a change, alteration, or conversion," as understood and applied by those who contend for a contrary doctrine, is not correct—for if so, then it would follow, that, in a contest between the representative of a deceased executor and the administrator *de bonis non,* for the possession of a security or evidence of debt, taken by the deceased executor for any demand due the estate of his testator, the possession and control of the same would not be awarded to the administrator *de bonis non ;* and yet the contrary has been held. See 1 Barnewall and Creswell, 150.

8

The negative of the proposition which appellant contends for, would leave one class of creditors without any remedy for the recovery of their demands—as, in the case of an estate wholly administered, or converted, before they had time to establish their demands by judgment.   See Judge Coalter's dissenting opinion, in 5th Randolph, 97 to 108.

A better definition of the term " administered" is this—the faithful performance by the executor, or administrator, of the duties required of him by law."   Vide Williams on Executors, 205, 207.   See, also, as to the authority of an administrator *de bonis non*, 1 Williams on Executors, 362. 1 Haggard, 139.

This is not the case of an administrator *de bonis non*, but of a substituted administrator; and the reasons which apply in favor of the exercise of the right claimed in the case of the former, apply, with more cogency, to the case of an administrator of the latter character.   The statute of this State provides that, " in the case. of the death of any administrator, or of the revocation of his letters of administration, the Judge of Probate shall grant *new* letters to the person applying, &c.," (not letters *de bonis non*,) evidently intending to give them a relation back to the date of the original letters.   Thompson's Digest, 198, 199.

As to the operation and effect of the order of the Judge, removing and dismissing the executor in this case, see 1st Florida Reports, 127.   1st Howard's Supreme Court Reports, 286.   1st Toller on Executors, 131.

If the administrator *de bonis non*, or the substituted administrator, has not the authority contended for, who has ? The heir cannot maintain an action at law, 13 Wendell, 456 ; nor can he sue in equity, 4 Paige, 47, 51.   4 Littell, 264.   Neither the heir nor distributee can sue, without first assuming the character of administrator.

*Erskine*, for Respondent.

An administrator *de bonis non* cannot bring an action at law, nor a suit in equity, for an account, against a removed executor. 1st Bacon's Abridgment, Accompt (c.) No powers are transmitted from the former executor to the administrator *de bonis non*, who is but the representative of the unadministered estate. Story's Equity Pleadings, sections 382, 619. 1st Kelly, 80. 2d Kelly, 428. 5th B. Monroe, 490. 5th Randolph, 51. 3d Kelly, 256.

Gregory, being merely the officer of the Court of Ordinary, appointed to finish a business began by another, he is only entitled to all the property which was of Nixon, the testator, at the time of his death, which remained in specie, and was not administered by Harrison, the removed executor. 4th Bacon's Abridgement, 24. 5th Randolph, 51 to 126. 1st Gill and Johnson, 270. 7th Missouri Reports, 471. 11th Alabama Reports, 872.

An executor is a trustee, but there is no trust affecting the assets themselves. The administrator *de bonis non* cannot follow the assets disposed of by the executor, or sue for their value, because the property vests absolutely in the executor, on the death of his testator. If he wastes it, he, or his representatives, are responsible directly to creditors, and others entitled, but not to the administrator *de bonis non*. 2d Williams Executors, 670, 672. 1st Howard's Mississippi Reports, 92. 8th Blackford, 168.

But it is contended that, if this doctrine be correct, then creditors, who have failed to establish their debts, are without remedy. It is answered, that an action at law may be maintained against the executor of an executor who has wasted the estate. 1st Saunders, 219, e. And since the statutes, 30th Car. 2, c 7, and 4 and 5 of William and Mary, c 24, there is no reason why an action cannot also be sustained against the administrator of an executor, who has committed a *devastavit*, without having first obtained

judgment against the devastating executor.   At any rate, a removed executor or administrator is directly and personally liable, and may be fixed with the debt.   11th Viner's Abridgment, 119.

Again: it is said that the appellant is a "substituted administrator." This is true; but for what, and whose substitute is he? He is the substitute of the ordinary, to administer what is left unadministered of the estate of Nixon. This is the extent of his authority; and his letters show that he was appointed administrator *de bonis non cum testamento annexo,* and he has, therefore, incurred the obligations, and acquired the rights of an administrator of that character.   As to the authority relied on by appellant's counsel 1st Haggard, 139, it has been questioned, if not overruled, by the Supreme Court of Alabama.   See 6th Alabama Reports, new series, 36.   See, also, 1st Howard, (Mississippi,) 89.   8th Blackford, 567.   9th Cowen, 320.   1st Richardson's South Carolina Reports, 123.   5th Johnson's Chancery Reports, 388, 409.

ANDERSON, *Chief Justice,* delivered the opinion of the Court.

This case is brought up by appeal from Gadsden Circuit Court.

A bill in equity was there filed by A. E. Gregory, as administrator *de bonis non administratis* of the estate of James M. Nixon, deceased, the purpose of which bill was to call Robert L. Harrison, former executor of Nixon, but who had been removed or dismissed from his executorship by the Probate Court, upon the complaint of some of the parties in interest, as provided for in our statutes.   The bill charges a *devastavit,* and prays " that an account be taken, &c., and that what may be found to be due by the said defendant, be decreed to be paid by the said defendant to complainant, as administrator as aforesaid."

It is not necessary to state at large the several allegations of the bill, nor to refer to the exhibits, further than to say, that they exhibit amongst other matters, a large balance to be due by the removed executor to the estate of his testator, on an order for a final settlement made by the Judge of Probate for Gadsden County, on the 27th of July, 1843.

The defendant, Harrison, demurred to the complainant's bill, " denying the right of the said complainant, as such administrator of the estate of the said James M. Nixon left unadministered by this defendant, to call upon and require of this defendant any account of the administration of the said estate by this defendant, in his capacity as executor of the last will and testament of the said James M. Nixon, deceased." It was the opinion of the Court below, that this demurrer was good, and the bill was thereupon dismissed. It will be perceived by this statement, that a single point is presented to the consideration and decision of this Court, and that is, whether an administrator *de bonis non* can call to account a removed executor, and charge him with a *devastavit*, as to the goods and chattels of his testator which have come to his hands.

It is the first time that this question has been before the appellate tribunals of this State, and it cannot be denied that it is one of some difficulty. This difficulty, however, we apprehend, grows rather out of the loose practice which has prevailed in some of the States of this country, and the consequent leaning of the Courts to sustain, for the sake of expediency, a practice regulating, by long acquiescence, the settlement of numerous estates, than out of any inherent obstacle to the ascertainment and adjustment of the respective rights and liabilities of parties standing in the relation to each other occupied by those before the Court.

To arrive at a proper understanding of these rights and liabilities, we propose, in the first place, to inquire whether, in any respect material to this controversy, a removed ex-

ecutor differs from the personal representative of a deceased executor, and then to look briefly into the early law respecting the character, rights and liabilities of administrators *de bonis non*, and of executors, and their personal representatives after their decease.

An executor derives his interest in the personal effects of his testator from the will itself, and the property in them vests in him, from the moment of the testator's death.

In England, with certain exceptions peculiar to that country, the Ecclesiastical Courts have exclusive jurisdiction of the probate of wills, and in this country, the Courts of Probate have succeeded to that jurisdiction. It results from the exclusive character of this jurisdiction, that an executor, though deriving his title from the will itself, cannot assert that title in any of the other Courts, until he is prepared to exhibit there a proof of the will from the Spiritual Courts ; in other words, he must have a probate of the will, or letters testamentary, before he can proceed effectively with the duties of his office—nevertheless, these letters testamentary are only attestations of his title, and, as a consequence of being only such, they have, when procured, relation back to the time of the testator's death. For the same reason, the executor, before probate, may do almost all the acts which are incident to his office, except only some of those which relate to suits. See 1st Williams on Executors, book 4, Chapter 1, Sections 1 and 2, and the authorities there cited. The Courts of our own country, in numerous cases, recognize these positions. Johns v. Johns, 1st McCord, 132. 3d McCord, 371. 3d Massachusetts, 514.

It follows, necessarily, from this view of the origin and source of an executor's title, that it exists independently of his letters testamentary ; and so far as relates to money collected, and goods reduced into possession, it cannot be divested, by the revocation of the letters testamentary. It is true that our statute (Thompson's Digest, 211,) gives to the

Judge of Probate authority to revoke letters testamentary, upon grounds not known to the English Courts ; but there is no authority given to divest the executor of the title which he acquired from his testator's will. The appointment of another administrator can only have relation to the goods not reduced to possession, and to *choses* in action not recovered.

A removed executor, then, notwithstanding the revocation of his letters testamentary, still holds his interest in the chattels reduced to possession—not as his own absolute property, but as trustee for the creditors, legatees and distributees of his testator, and to them he is accountable.

The administrator of a deceased executor occupies the same position. The death of the executor is a virtual revocation of his letters testamentary from that time, though they may be used in his behalf, as evidence of his authority, for acts done during his life-time—as the removed executor may resort to his cancelled letters, to justify his antecedent acts. The administrator succeeds to the deceased executor's title in the first testator's effects, so far as they have been reduced to possession—that is to say, to his title as trustee for the creditors, legatees and distributees, and is bound to account to them just as the removed executor retains his title and obligation to account. It is not correct to say that the administrator *de bonis non* is the substitute of a removed executor—this last derived his authority from the testator's appointment, and the other from the ordinary, in virtue of the ordinary's right to take charge of the goods of a deceased person, which are not in charge of an executor of his own choice. The exercise of the ordinary's right begins where the exercise of the better right of the testator stops, or is arrested, by the removal of his appointee. By the common law, the rights of an executor and of an administrator *de bonis non* to the residuum of the estate were essentially different, and, therefore, the one cannot be cor-

rectly regarded as the substitute of the other—the former being entitled to the residuum in his own right—the latter, as the bailiff of the ordinary, and accountable to him that the assets might be distributed, *in pios usus*, at the ordinary's pleasure.

Without tracing this analogy any farther, we think it very evident that, in regard to the accountability of a removed executor to an administrator *de bonis non administratis*, he stands on the same footing with the representative of a deceased executor, and in the further consideration of this subject, we shall so consider him.

We proceed next to inquire into the character, rights and liabilities of an administrator *de bonis non administratis*.

I think a very clear and accurate apprehension of these, may be derived from the terms of the warrant under which he acts. His commission gives him power to represent the testator, or intestate, so far as there remained unadministered " the goods, and chattels, and credits which were of the testator, or intestate, at the time of his death." All the difficulty and obscurity which have rested upon the extent of the power of an administrator of this character, grow out of a lack of definiteness in the import of this word unadministered. Taken alone, it is conceded that its meaning may not be precise and obvious beyond all danger of mistake, but taken in connection with the other words employed in the commission, there can be no real difficulty in fixing its precise meaning. Let us turn our attention for a moment to these other words, and for the purpose of illustration, let us advert to the facts of the case before the Court.

At the time of Nixon's death, it appears, from the inventory found among the exhibits, that he was possessed of much real and personal estate, and had large and numerous debts due to him upon bonds and notes. All these, with the exception of the real estate, were strictly and truly

"the goods and chattels, rights and credits, which were of the testator at the time of his death," and as such, they passed, in entire conformity with the commission of an executor, into the hands of Harrison, the defendant in this suit.

The complainant's bill alleges among other things, that Harrison rented out the real estate, and received the rent ; that he hired out the negroes, and received the hire ; that he collected the bonds and notes, and has not accounted for the proceeds ; and it further charges, that, chiefly in consequence of unaccounted for sums of money, the defendant is indebted to the estate of Nixon, in an amount exceeding eleven thousand dollars. He demands from Harrison this sum—that is to say, the complainant, under his authority to *represent Nixon, so far as there remained unadministered goods, chattels and credits, which were of Nixon at the time of his death, demands* the rents and hires which have issued subsequently to Nixon's death, out of the lands and negroes left by him, and he demands the money paid to Harrison on the bonds and notes, in extinguishment of the " credits" which once belonged to Nixon. Were the rents received by Harrison, of the goods and chattels of Nixon, at the time of his death ? Surely not. Were the hires received on the negroes after Nixon's death, of his goods and chattels at the time of his death ? Surely not. Is the money now in the hands of Harrison, arising from the collections of the bonds and notes, in any sense " of the goods and chattels, rights and credits" of Nixon, at the time of his death ? Again, we may reply, surely not; and if not, then the commission of the administrator *de bonis non* gives him no warrant to demand them.

It may be said, and has been said in the argument of this case, that, as these various sums have passed into Harrison's hands, he thereby became a debtor to the estate of Nixon, and that his debt became one of those rights and

9

66                    SUPREME COURT

Gregory, Administrator *de bonis non, vs.* Harrison.—Opinion of Court.

credits which Gregory, the complainant, has authority to administer. In reply to this, all that is necessary to say is, that, although it may be called a debt to Nixon's estate, it certainly is not a debt which was due to him at the time of his death, and if not, it comes not within the reach of the commission of the administrator *de bonis non.*

These considerations establish very clearly, I think, that, to the money coming into the hands of an executor from the various sources to which we have adverted, an administrator *de bonis non* can assert no claim. The want of right to assert a claim to goods which have been converted by the executor, is based upon the same general principles, though, perhaps, not so obviously. And this brings us to the definition of the word administered; for what has been administered has passed, without dispute, beyond the reach of the administrator *de bonis non.* In the case of Coleman v. Mc-Murdo, 5th Randolph, 51, (to which we shall have occasion to refer more at large hereafter,) the word *administer* is defined by two of the Judges, in their opinions, to be equivalent to " alter, change, or convert," and we think these words, properly understood, may, for all necessary purposes, be regarded as a correct definition of the term. But we think these terms, change, alter and convert, have, to some extent, been misapprehended, and this has led to the confusion of ideas manifest in some of the opinions referred to. Although Judge Carr speaks of " a change, or conversion of the goods," he very clearly means a change *in the property of the goods.* This is apparent from the very first authority which he quotes in elucidation of his definition. In 2 Peere Williams, 340, Attorney General against Hooker, Lord Chancellor King said, " As to what has been urged, that, if an executor dies intestate, all the personal estate, *the property whereof is not altered,* shall go to the administrator *de bonis non,* and not to the next of kin to the executor—this is true, &c." A change in the property of the

goods is, therefore, what is meant by these learned judges, as amounting to an administration—not a change in specie. This is further and strikingly illustrated in one of the cases that have been cited, where an executor collected the debt of his testator, and having kept the money separate and distinct in a bag, it was, after his death, adjudged to belong to the administrator *de bonis non.* In this instance, there had been a change in the goods, for a debt due had been changed into money; but, inasmuch as the *property* had not been changed, as was apparent, from the executor keeping the money apart and marking it as the property of his testator, there was no change, alteration, or conversion, in the technical, legal sense. That this conversion of the goods of the testator is no wrong, is evident from a consideration of the object and purposes of the executor's trust. The title of the goods vests in him, upon the death of the testator, subject to the condition of his reducing them to possession. He can give title to such alienees as purchase from him, and if he so chooses, by exercising acts of ownership over them, he may convert them to his own use; but in the former case, he is responsible for the purchase money received, and in the latter case, for the value of the goods converted; but responsible to whom?

This inquiry brings us to the consideration of the rights and liabilities of an executor. The latter of these we will first ascertain, as it will lead us to a better understanding of the former, and it will be found that the one is correspondent to, and exactly commensurate with, the other. Before the statutes of 22d and 23d Charles 2d, no executor could be called to account for the portion of the estate remaining in his hands, after the debts and legacies had been paid; but that statute, known as the statute of distributions, provided for the distribution of the fund, and gave a remedy for enforcing it, to the parties in interest. Before that time, the Ecclesiastical Courts had authority to enforce the payment

of legacies, and in Lord Nottingham's time, the Court of
Chancery undertook to extend its aid also to legatees. Tol-
ler's Law of Executors, 489.

The debts, covenants and other contracts of the testator,
the Courts of Law have provided abundant means of en-
forcing, (Toller, 457;) and the Court of Chancery also lends
its searching and powerful sanctions in behalf of enforcing
claims of this class, which are of an equitable nature. Tol-
ler, 478.

The liabilities, then, of an executor are of such a nature,
that they necessarily embrace the entire fund which may
come to his hands. What remains, after the claims of credi-
tors and legatees are satisfied, goes, by a certain law, to
certain specified persons.    What is this fund which is thus
ascertained to be the measure of the executor's liability? In
the words of an elementary writer of high reputation—
" all the personal estate whereof the testator died possess-
" ed, whether it consists in chattels real, or chattels perso-
" nal, belongs to the executors, and are assets in their hands,
" for the payment of the testator's debts and legacies."    3d
Bacon's Abridgment, 57 ; and so of debts due to the testa-
tor, after they have been recovered by the executor.    3d
Bacon's Abridgment, 58.

It results from this, that, when money has been collected
by the executor out of the debts due to the testator, and
when any personal estate has been sold by him, or convert-
ed to his own use, he becomes, to that extent, directly lia-
ble, by means of the various remedies of which we have
spoken, to the several persons having claims as creditors,
legatees, or distributees.    To refer again, by way of illus-
tration, to the case before us.    Harrison, upon the death of
Nixon, and the receipt of his letters testamentary, became
responsible—first, to the creditors of his testator, then to his
legatees, and, lastly, to his distributees.    The measure of
this responsibility is furnished by the amount of assets

realized by him—that is to say, by the amount of the very fund which the complainant here is seeking to have made payable to him by Harrison.

This undoubted liability of Harrison must have a correspondent right, and that right can be no other than the right of being protected from the claims of a third party to this very same fund. The discharge of Harrison from his executorship does not release him, any more than his death would have released his personal representative from his responsibilities to the creditors and others; and there is no principle of law, or equity, or of common justice, that will hold him at the same time, and out of the same fund, responsible to another party.

Another well established rule of the law of administration, may be called to our aid, in favor of the conclusions which we have deduced, from a comparison of the respective rights and liabilities of the removed executor, and of the administrator *de bonis non.*

The claim which the creditor of a testator has, is not in the nature of a lien upon the goods of the testator, but is a personal claim against the executor. Mr. Justice Buller has said—" At law there is no such thing as a *fund* in the hands of an executor being the debtor; but the person of the executor, in respect of the assets which he has in his hands, is the debtor." And to the like effect, Lord Hardwicke has stated—" By law, undoubtedly the executor has power to dispose of and alien all the assets of the testator, and when he has done so, no creditor of the testator can, in point of law, follow those assets; for the demand is not at law a lien, or charge upon the assets, but a demand against the executor, in right of the testator, in respect of the assets, *and so is a personal demand.*" Ram's Treatise on Assets, page 494, and authorities there cited.

The claim of the creditor, then, being a personal one upon the executor, in respect to the assets which have come

into his hands, does not follow those assets into the hands of other parties, except that, in some excepted cases, equity will aid a creditor in doing so ; but these exceptions do not disturb the conclusions derived from the general rule.   The recovery, therefore, of assets by an administrator *de bonis non* from the removed executor, would not transfer the creditor's claim—in the words of Lord Hardwicke, just quoted, "no creditor can follow those assets ;" the claim against the executor being a personal one, would survive the transfer of the assets, and in this way, the law would be made the occasion of working gross injustice.

The true rule, and the consistent one, evidently is, that, for the value of the goods administered, or converted, the executor is liable only to the creditors, and those standing in a like relation ; for any other liability would be a cumulative, and not a substituted one, and, therefore, cannot be supposed to be contemplated by the law.

It does not interfere with any of these general conclusions, that an administrator *de bonis non* may take possession of the goods and chattels of the first testator, or intestate, which remain in specie, and unadministered.  Though the title of the first executor attaches to them upon the testator's death, as . it does to all the personal effects, that title being *en autre droit*, and not personal to himself, requires that the goods be reduced to possession, before the title is consummated.   The Courts, both of law and equity, will lend him their aid, in thus perfecting his title; but, as we have seen, they require, before doing so, the exhibition of proof of his having established before another tribunal his authority as executor—in other words, his letters testamentary must be exhibited.   These Courts refuse to invade the province of the Ecclesiastical Courts, and to admit any other evidence but their's of the alleged authority, and it follows that, when the Ecclesiastical Court withdraws its testimony, when it revokes the letters testamentary, there

remains no other mode by which the executor in the other Courts can show his right. They, therefore, refuse to hear him—his title to the personal effects not reduced to possession, cannot be consummated, for want of a remedy, or rather of a forum before which to assert it. Then comes in properly and consistently with the rights and interests of all parties, that other officer of the law, known as an administrator *de bonis non administratis*. The effects of the first testator remaining unadministered, or unconverted, by the deceased or removed executor—being beyond the reach of administration by the representative of the deceased executor, or by the removed executor, by reason of the absence of the necessary evidence, whereby to reduce them to possession—are not suffered to be lost to the estate of the testator, but the Ecclesiastical authority appoints, in respect to them, a new administrator, and clothes him with power to possess and administer them to the extent of his authority, and no more. He is appointed to finish what is left unfinished, and for no other purpose. Let us illustrate the extent and the limitation of this latter officer's power and authority, by a reference to the successive steps he would take in using the remedy provided for him, in reducing a chattel of the original testator into possession. He finds such a chattel in the possession of a stranger, who refuses to deliver it up on demand—he sues in trover, and proves the original property in the testator, and exhibits his own letters of administration.

The defendant relies upon the title derived from the executor. If it came from the executor during his life-time, or before his removal, the Court will permit the defendant to exhibit the letters testamentary, as evidence of the executor's title under the testator, and the defence is complete. If the title came from the executor after his removal, or from his administrator after his decease, the Court allowing no other evidence than the letters testamentary, and

72                    SUPREME COURT

Gregory, Administrator *de bonis non*, *vs.* Harrison.—Opinion of Court.

they, at the time of passing the title, having been cancelled by the Ecclesiastical Court, or virtually cancelled by the executor's death, then there is no proof of the defendant's title, and the administrator *de bonis non* must recover. So, if he were to sue in *assumpsit* for a debt due the testator at the time of his death—if it had been paid to the executor before his removal—the letters testamentary would have been allowed, as competent evidence of the executor's authority to receive, and this defence properly set up would be a bar to the action. If it had been paid to the executor after his removal, the right of the executor to receive it could not be made available, either in abatement, or in bar, not so much of the absence of title in the executor, as on account of the want of the evidence of that title— the letters testamentary having been cancelled, and the Court refusing to admit any other evidence.

To apply this species of illustration to the parties now before the Court. If Gregory were to sue Harrison in *trover*, for a chattel converted by Harrison, his right to recover would depend upon the time of the conversion by Harrison—if it were subsequent to the revocation of his letters testamentary, he, Harrison, would be without evidence of his title, and, therefore, without defence—if prior, his letters would be a sufficient warrant for the conversion—his inchoate title, derived from his testator, had been made consummate by conversion, and he would, necessarily, prevail against Gregory; in other words, the chattels would have been administered, and, therefore, beyond the reach of one whose authority only extended to goods *unadministered*. If Harrison had not yet accounted to the estate for the value of the chattel, he must owe a debt somewhere; but all that is necessary to say about it, in reference to the rights of Gregory, is, that it was not a debt due to the testator at the time of his death.

It will be perceived, from a review of the general princi-

ples of law, regulating the respective rights and liabilities of the parties of which we have spoken, and of the corresponding remedies which have been provided for the assertion of those rights, and the enforcement of those liabilities, that the entire sytem is harmonious and symmetrical throughout. The creditors, legatees and distributees of the testator, have a certain recourse and adequate remedies against the first executor, and the extent of this recourse is well defined ; for it is exactly commensurate with the value of the effects of the testator which come to the executor's hands. These rights of the creditors and others being personal as to the executor, and not attaching to the effects themselves, are not divested by the removal of the executor from his executorship. They still remain, and although they may be curtailed in their extent, in consequence of the disability of the removed executor to proceed in collecting the uncollected debts due to the testator, and in reducing to possession the other unadministered assets, yet, to that precise extent, are the rights of the creditors and the others transferred to the new administrator. Thus these rights are co-extensive with the estate—personal as to the removed executor, to the extent administered by him, and personal as to the new administrator, to the extent unadministered by the former. The two responsibilities of the executor and administrator *de bonis non* are, in mathematical phrase, complements of each other—making, together, an entirety.

By the just and equal operation of these general rules, these two officers, representing the testator's estate successively, are protected from conflicting and contradictory claims. Each stands alike, in the relation to the creditors, legatees and distributees, of responsibility, to an extent well defined and easily ascertained, but neither is responsible to the other ; for any such responsibility would mar the symmetry of the system, and introduce disorder and injustice.

10

Having thus looked into the elementary principles of the law of administration, and drawn from them certain conclusions, as to the relative rights and liabilities of the parties before the Court, we will proceed to inquire how far these conclusions are sanctioned by authority

It has been said in argument, and also in the opinions of some American Judges, to which we shall have occasion to refer, that there are no reported cases to be found in the English books, sustaining the views we have taken. This may, perhaps, be so, if express adjudications of the question are meant ; but the incidental denial of the right of an administrator *de bonis non* to sue a representative of a deceased executor for goods converted by the executor, may be repeatedly found. The following instances are quoted from the opinion delivered by Judge Carr, in the case of Coleman v. McMurdo :

In 2d Peere-Williams, 340, Attorney General v. Hooker, Chancellor King said—" As to what has been urged, that, if an executor dies intestate, all the personal estate, the *property whereof is not altered,* shall go to the administrator *de bonis non,* and not to the next of kin of the executor— this is true, because, from the time the executor dies intestate, the first testator dies intestate also, and it was the executor's own fault that he did not, as he might, alter the property."

In Rutland v. Rutland, 2d Peere-Williams, 210, the same doctrine is explicitly laid down.

In 1st Bosanquet and Puller, 311, Tingrey v. Brown, Chief Justice Eyre and the Court say—" That every thing is unadministered which had not been reduced into actual possession, and converted by the administrator."

In 1st Salkeld, 316, Chief Justice Holt, after laying down the rule, that the same hand having to pay and receive, is an extinguishment, puts this case—" If the executrix of the obligee takes the obligor to husband, that is no extinguish-

ment, for he may pay her money as executrix, and if she lay this money by itself, the administrator *de bonis non* of her testator (if she dies intestate) shall have that money, as well as any other goods that were the testator's; for if the goods remain in specie, they shall go to the administrator *de bonis non*, because, in that case, it is notorious which were the goods of the testator, and they are distinguishable; and there is the same reason where money is kept by itself, and the husband permits it so to be; but if the husband seizes it, it will be his, and will be a *devastavit.*" The elementary writers of England concur in the distinctions thus made by the Courts.

In 3d Bacon's Abridgment, page 19, the enumeration given of the property which an administrator *de bonis non* is entitled to, corresponds with the views we have taken of his rights. " An administrator *de bonis non* is entitled to all " the goods and personal estate, such as terms for years, " household goods, &c., which remain in specie, *and* were " not administered by the first executor or administrator— " as, also, to all debts due and owing to the testator, or in- " testate. Also, it is holden, that, if an executor receives " money, in right of the testator, and lays it up by itself, " and dies intestate, this money shall go to the administrator " *de bonis non*, being easily distinguished to be part of the " testator's effects, as goods in specie. But if A dies intes- " tate, and his son takes out administration, and receives " part of a debt, being rent arrear to the intestate, and ac- " cepts a promissory note for the residue, and then dies in " testate, this acceptance of the note is such an alteration " of the *property* as vests it in the son, and, therefore, on his " death, it shall go to his administrator, and not to the ad- " ministrator *de bonis non*." Mr. Bacon here furnishes at once authority for, and illustrations of, most of the positions which we have been considering at length.

The goods to go into the hands of the administrator *de*

*bonis non* must be *in specie*, and also unadministered. The two illustrations show what meaning the author gives to the word " administered." In the first, the money to the administrator *de bonis non*, because there is no conversion of property, though there had been a change of a debt into money. In the second illustration, there had been " an alteration of property," and it is taken as an act of administration, and, therefore, the note does not go to the administrator *de bonis non*. In this last instance, it will be observed, also, that the note had been in no wise applied by the administrator to the payment of his intestate's debts. The simple act of altering the property, by making it his own, was administering it, so far as the administrator *de bonis non* was concerned. It will be observed, also, that, in the cases stated, there was a change in the character of the goods—in the first, there was no change of the property, but in the second, there was, and hence in the first, the money, being unadministered, went to the new administrator, but in the other, the money represented by the note, being administered, did not.

In Loveless on Wills, at page 89, it is said, " All those " goods, chattels and effects, which belonged to the deceas- " ed, in action or possession, as his own, and so continued at " the time of his death, and which, after his death, the ex- " ecutor or administrator *gets into his hands*, as duly apper- " taining to him in right of his executorship or administra- " tion, shall be assets in the hands of the executor, to make " him chargeable to a creditor, legatee, or party in distribu- " tion, as far as such property extends." Here it will be perceived that the *possession* of the goods makes him chargeable. He may relinquish this possession after his removal, or his representative may do so after his death, to a new administrator, and thereby he will be discharged ; but so long as he retains possession, or waste having been committed, restitution becomes impossible, he remains charge-

able, and so does his representative ; but to whom ?—to creditors, legatees and parties in distribution, but not to the administrator *de bonis non*.

The American cases, in confirmation of the views we have presented, are numerous and decided. We proceed to refer to some of them.

The case of Coleman v. McMurdo and Prentis, reported in 5th Randolph, 51, is precisely of the character of the one before us, so far as regards the controverted points, and the Court having bestowed much labor and research on its consideration, the opinions of the Judges, delivered at great length by every member of the Court, are entitled to very great respect. The Courts of several other States have regarded this decision as settling the question, and to us it appears that the arguments of the majority of the Court are unanswerable. The head note of that case is as follows : " An administrator *de bonis non* cannot sue the representative of a former executor, or administrator, either at law or in equity, for assets wasted, or converted by the first executor, or administrator ; but such suit may be brought directly, by creditors, legatees, or distributees." The opinion of one of the Judges of the Court (Coalter) was opposed to this conclusion ; but I think it will be perceived, from an attentive reading of his opinion, that he was influenced in a very great degree by a consideration of the inconvenience likely to arise from the decision of the Court, which, it was alleged, was in conflict with the long established and uniform practice of the Inferior Courts of Virginia, and that, in view of these consequences, his reasoning was directed to conclusions not warranted by his premises. It will be proper here to remark, that Judge Coalter, in his opinion, doubts whether the statute of 30th Car., 2, explained and made perpetual by that of 4th and 5th William and Mary, affords a sufficient remedy against the personal representatives of a deceased executor, to any but *judg-*

*ment* creditors. If·this doubt was well founded, it would certainly interfere with the reasoning by which we have endeavored to establish the respective and harmonious rights of all the parties representing and interested in a testator's estate ; but we think it is not, as is shown in the opinions delivered by the other Judges.

The case of Sibley v. Williams' Executors, 3d Gill and Johnson, 52, elsewhere cited on another point, expressly affirms the right of a creditor to sue the representative of a deceased executor, for a debt of the original testator, without having first obtained a judgment against the executor in his life-time. The Judge, who delivered the opinion of the Court, says that such a right was given to creditors by the statutes of 30th Car., 2, and 4th and 5th William and Mary, and he quotes the construction given to those statutes by Sergeant Williams, in his Notes on Wheatly v. Lane, 1st Saunders, 219, as authority for the opinion. To sustain his construction of the statute, Judge Coalter is forced to question this authority of Sergeant Williams. He says, " Sergeant Williams seems to intimate that it (an action) may be sustained against the executor or administrator of the executor or administrator, without a previous judgment establishing a *devastavit.*" On reference to the note, it will be found that the learned Sergeant's *intimation* is expressed in very decided and unequivocal terms. Speaking of the distinction between an action against the executor in his life-time upon a judgment, suggesting a *devastavit* by him, and one against the executor of such an executor, suggesting a *devastavit* by the former executor, he says : " The former action can only be brought *upon a judgment* previously obtained against the executor *de bonis testatoris*, or where he is made a party to a judgment against a testator, by *scire facias ;* but in the other, an action may be brought in every case, where the testator, in his life-time, was in any way guilty of an act which amounts in law to a *devastavit.*"

In perfect accordance with this so called intimation of Sergeant Williams, Judge Green, in the case from 5th Randolph, says : "It seems to me that the statute gives a right to all creditors, whether they had obtained judgment against the executor or administrator in his life-time, or not, to sue the representative of the executor or administrator, and to allege in the declaration the existence of the debt—that assets sufficient to pay it had come to the hands of the executor or administrator, and that he had wasted or converted them. This construction is necessary to give effect to the statutes."

But this doubt of Judge Coalter, as to the construction of these statutes, even if well founded, does not affect the particular case before us. Upon this point, there is a difference between a removed executor, like Harrison, and the representative of a deceased executor. By the principles of the common law, Harrison, though removed, would be responsible for a *devastavit*, and recourse need not be had to the statute to prove, by analogy, this liability. But a *devastavit* being a *tort*, died with the person, and the creditor's rights and remedies were at an end, where the executor committing a *devastavit* died, until continued by the statutes, and transferred as against his representative. Without the statutes, therefore, Harrison would be still liable, as are executors *de son tort*, and a displaced administrator, after a wrongful administration has been revoked. 11th Viner's Abridgment, 119.

In the case of Alsop v. Mathers and others, the Supreme Court of Errors of Connecticut says : " The extent of the liability of an administrator *de bonis non* is defined by the condition of his bond—this is prospective, and restricted to estate not administered. No part of the condition of his bond creates or recognizes any privity between him and his predecessor, nor makes him responsible for any *devastavit* or default of another, either of omission or commission." 8th Connecticut Reports, 564.

In the case of Chamberlain, administrator *de bonis non*, v. Bates, 2d Porter's Reports, 550, it was decided that an administrator *de bonis non* cannot sustain an action at law against the representatives of a former administrator, to recover money received by the latter, in the course of a partial administration, and not accounted for, or paid over. Delivering the opinion of the Court, the Chief Justice adopts and endorses the reasoning of the Court, in the case of Coleman v. McMurdo, from 5th Randolph, and affirms its judgment. In speaking of the distinction between a removed administrator, and the representative of a deceased one, he says : " The statute authorizes the Orphan's Court, where administration has been granted on insufficient security, to require other that is sufficient—also, where any administrator has embezzled, wasted, or misapplied all or any of the decedent's estate, or shall refuse or neglect to give bond, with security, as aforesaid, to forthwith revoke or repeal the letters of administration, and grant others to such persons entitled thereto, as will give the requisite bond. The subsequent administrator may have actions of trover, detinue, account and on the case for such goods and chattels as came to the possession of the former administrator and were withheld, wasted, embezzled, detained, or misapplied by any of them, and no satisfaction made for the same. By this, I would understand that authority is given to the new administrator immediately to institute either or all the actions mentioned, that may be the most appropriate for any misconduct, or either of the wrongs therein specified. It is justly to be inferred that the Legislature, by expressly prescribing these remedies, intended to confer on the subsequent administrator more extensive powers than by the common law are incident to administrators *de bonis non ;* otherwise, it would have been sufficient merely to have authorized the removal, and the subsequent appointment." It thus appears that the analogy which we have attempted to

JANUARY TERM, 1851.　　81

Gregory, Administrator *de bonis non*, *vs.* Harrison.—Opinion of Court.

show exists between the case of a removed executor, and the representative of a deceased one, according to the principles of law, apart from any statute, is sanctioned by the opinion of the Chief Justice.

In Pennsylvania, it was held, in the case of Potts v. Smith, 3d Reports, 361, that " an administrator *de bonis non* can claim nothing but the goods of the intestate remaining *in specie* unconverted and unchanged at the time of the death of the original administrator." The law, as thus interpreted, was afterwards changed in that State by statute.

The Court of Appeals of Maryland, in the case of Hagthorp and others v. Hook's administrator *de bonis non*, 1st Gill and Johnson, 271, and in the case of Sibley v. Williams, 3d Gill and Johnson, 52, sustains the principles which we have been asserting, except so far as they are modified by the statutes of that State.

The Supreme Court of Georgia, in the case of Thomas v. Hardwick, 1st Kelly, 78, adopts fully the reasoning and conclusions of the Virginia case. Judge Lumpkin, quoting from the opinion of Judge Carr, repeats that the statute of 30th Car., 2d chapter, 7, explained and perpetuated by the 4th and 5th William and Mary, expressly declares in its preamble, that executors and administrators, for want of privity, were not before answerable, nor could be sued for debts due by the first testator, or intestate—notwithstanding such executors or administrators had wasted the estate of the first testator, or intestate, and to remedy this evil, it makes such second executors or administrators chargeable. How ? To the administrator *de bonis non* ? No ; but chargeable in the same manner as the first executor or administrator should, or might have been—that is, directly to the creditors. The Court decides that " an administrator *de bonis non* cannot call the representatives of a deceased executor or administrator to account for any property which their testator, or intestate, may have converted, or wasted."

11

This case is the more noticeable, because the defendant was a removed executor, and the decision of the Court sustained the right of a creditor to recover from him after his removal, for a debt due by the testator.

The Court of Appeals in Equity of South Carolina, in Smith v. Carrere, 1st Richardson, 123, fully approved the views of the Court in the case of Coleman v. McMurdo.— We shall have occasion hereafter to refer to a case subsequently decided in South Carolina, in which this case is reviewed, with dissent from some of its conclusions.

The Supreme Court of the State of Indiana, in Young v. Kimball, 8th Blackford's Reports, 167, adopting the Virginia precedent, held, where an administrator having committed a *devastavit*, died, and his administrator was sued in Chancery by the administrator *de bonis non* of the first intestate for such *devastavit*, that the suit would not lie; and, also, that, under the statutes of 30th Car. 2d, and 4th and 5th William and Mary, and a similar statute of the State, that the administrator, thus sued, was liable for the *devastavit* to the creditors, &c. of the first intestate.

We think that these citations show sufficiently that the rule established in the case of Coleman v. McMurdo, (significantly enough called in argument the mother of American cases,) has met with the general approbation of the Courts of the several States. The case of Villard v. Roberts, before alluded to, as seeming to dissent from Smith v. Carrere, may, to some extent, be admitted to be an exception to the general acquiescence; but the Court, on that occasion, was not very decided in its dissent, and was evidently under the bias of a fear that the adoption of the Virginia decision would introduce an inconvenient change in the practice of the Probate Courts. The case is reported in 1st Strobhart, 393. The Chancellor, in delivering the opinion of the Court, frankly admits that the Court "were more influenced by the uniform and recognized practice in our

own State, than by any other consideration." "This, of it-self, would be a sufficient reason, in the eye of this Court, for the judgment it now delivers—for the loss and disappointment to parties who have made settlements upon faith in the prevailing usage would be incalculable, if a different rule were suddenly adopted."

The judgment of a Court, however reputable, which thus avows that the argument of convenience is paramount with it to all other considerations, can have but little authority beyond the borders of its own State, when in conflict with the numerous other Courts whose decisions have been cited, and when the same considerations of convenience are not applicable elsewhere. But besides this, though the Chancellor, in his opinion, calls in question the principles established in the cases of Coleman v. McMurdo, and Smith v. Carrere, yet the point *decided* by the Court is in perfect harmony with those cases, as well as with the rules which we have been endeavoring to establish.

A bill was filed by persons claiming under a legatee, against the personal representatives of deceased executors of McKenzie, praying for an account, &c. The defence set up in the answer was, that the defendants had settled with Chovin, the administrator *de bonis non* of the first testator. In reference to this defence, the Court of Errors say, in the judgment of the Court—"It is ordered that it be certified to the Court of Appeals in Equity as the opinion of this Court, that the account and settlement between the representatives of the executors of McKenzie, and Chovin, the administrator *de bonis non* of said McKenzie, pleaded as a bar to the account sought in the bill against the said representatives, is a sufficient bar thereto." This order is in perfect consistency with the principles which we have been maintaining, and is not contradictory of any of the cases cited. It will be recollected that, in an early part of this opinion, in anticipation of the very difficulty presented

by this case, and, also, with a view of fixing more accurately the points involved in this question, I endeavored to give a more precise meaning to the words " alter, change and convert," than prevailed in some of the authorities cited, when they were used as defining the word administer. I said that the *change*, the *alteration*, the *conversion*, must be understood as applying to the *property*, and not to the goods themselves—that the property in goods, which themselves might remain *in specie*, might, nevertheless, be changed ; and on the other hand, the goods might be altered *in specie*, and yet remain unchanged as to property. This distinction was illustrated and proved by the case of money received by an executor, in payment of a debt due to his testator, and kept by him in a bag, separate and apart, and distinguishable from his own money—it was held to belong to the administrator *de bonis non*, as not having been converted or changed as to property by the executor, because, by keeping it apart from his own money, he showed that he did not consider it as his own.

The application of this distinction to the case of Villard v. Robert, makes the judgment of the Court consistent with the general conclusions at which we have arrived. The personal representative standing in the place of the deceased executor, pays over to the administrator *de bonis non* the assets of the first testator remaining in his hands, and by so doing, negatives the idea of a *devastavit*, or an intention to convert, on the part of him whom he represents. The goods may have been changed in specie, but that the *property* was not changed, is evidenced by the voluntary relinquishment of it by the executor, through his personal representative. When we remember that a creditor, in suing the personal representative, would have had to establish a *devastavit* against the executor, and that this cannot be done where the executor and his representative disprove the waste, by having always recognized the property as in the

original testator, and relinquished it as such, to his new representative, we perceive that this case forms no exception to the rule, and does not conflict with the principles we have asserted.

In the case of Hagthorp v. Hooks, administrator *de bonis non*, heretofore cited, the Chancellor says : " In a Court of Equity particularly, an executor or administrator, who is there considered as a trustee for the creditors, legatees and next of kin of the deceased, is expected and required to preserve the property of the deceased, apart from his own, and by itself—to give it, as is said, an ear mark, that it may be always known, and readily traced to any one into whose hands it may happen to fall ; *and if he does so,* the Court will do every thing that can be done to protect and assist him."

In the case of Villard v. Robert, the executor, and his representative after him, " had preserved the property of the deceased apart from his own," and, in accordance with the equitable rule laid down by Chancellor Bland, when this separation was consummated by the delivery of the property to the new administrator by the executor's representative, " the Court did every thing which could be done to protect and assist him."

It remains to advert briefly to one or two points in the ingenious argument of the counsel for the appellant, which we have not noticed in the general consideration of the elementary law upon this subject. It is alleged to be " an uncontroverted doctrine, that the administrator *de bonis non* may pursue and recover from the purchaser any specific chattel which has been collusively disposed of by the first executor ; and yet he is denied the right to recover the proceeds of this property, because it happens to be in the hands of the representative of him who participates in the fraud." No authority is quoted in support of the proposition here set forth, but we take it to be unquestionably true. The

case stated supposes a *fraud* on the part of both parties to the purchase, and the collusive fraud vitiates the contract. It was no purchase on the part of the purchaser—no conversion or change of property on the part of the executor, and therefore no administration. It remained of·the goods and chattels of the testator *unadministered and undisposed of*, and belonged of right to the administrator *de bonis non*.

Again, it is alleged by counsel that no one in the character of heir can maintain an action at law (or in equity,) for the personal estate of the testator, and, to entitle himself to sue, he must obtain "a. grant of administration," and distributees are supposed to be under the same inability. Again we say this is undoubtedly true, but *non constat* that the distributee, though disabled from suing as such for the *personal estate* of the testator, may not sue the proper party for a *devastavit*. The legal maxim asserted by counsel obviously applies to the suits of heirs or distributees for property of their ancestor in the hands of strangers, and not to their suits against executors or their representatives.

This opinion has already extended to so great a length that we shall have to pass over, without remark, some of the minor difficulties which have been suggested. We think they may all be easily removed or explained by a careful reference to the general rules which we have deduced from the law, from precedents and from authority. The great importance of these rules, in the settlement of the estates of deceased persons, and the necessity of their being well defined and clearly understood, have induced us to enter into the discussion of the principles upon which they are based, more elaborately than would be necessary on subjects of less interest, and we have regarded it as especially desirable to establish, thus early, some uniform and authorized practice in reference to the administration of estates, before loose and vicious precedents become established and consecrated by long usage, and thereby tempt the courts, through

considerations of convenience, to swerve from the rigid discharge of the duties of their high commission.

Believing, as we do, that an administrator *de bonis non* has no authority to call to account the representative of a deceased executor for a *devastavit,* and, by parity of reasoning, that he has no authority to call to account a removed executor, we are of opinion that the order of the Court below, dismissing the bill of complainant, was correct, and it is therefore affirmed.